**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Criminal Action |
| | : | |
| v. | : | |
| | : | No. 26-18 |
| DERRICK CHAPPELLE | : | |

**<u>MEMORANDUM</u>**

Perez, J.                                                                                          **July 17, 2026**

On January 8, 2026, a federal grand jury returned a one-count Indictment charging the Defendant, Derrick Chappelle, with possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1). ECF No. 1. The charge arises from Defendant's alleged possession of a Ruger P95DC 9mm semiautomatic pistol with an obliterated serial number, which was loaded with fifteen rounds of ammunition. Defendant now moves to suppress the firearm and ammunition recovered from his person. ECF No. 37. Defendant argues that Philadelphia police officers subjected him to an unlawful stop and frisk without reasonable suspicion. He also contends that this federal prosecution is improper because he previously faced state firearms charges arising from the same incident.

The Court held an evidentiary hearing over two days, on June 8 and July 8, 2026. The Government called Philadelphia Police Officers Tejwant Goberdhan and Nicholas Van Brunt, the two officers involved in the encounter, and introduced footage from each officer's body-worn camera, along with still images taken from that footage. The hearing focused principally on what the officers observed before they approached Chappelle, whether the video evidence corroborated those observations, and whether those facts justified the officers' decision to secure the firearm.

1

After considering the testimony, the video evidence, the parties' submissions, and the governing law, the Court will deny the motion.

## I.      FINDINGS OF FACT

On March 8, 2024, Officers Tejwant Goberdhan and Nicholas Van Brunt were on uniformed patrol in a marked Philadelphia Police Department vehicle in the area of 25th Street and Montgomery Avenue. Officer Goberdhan testified that the area is known for shootings, homicides, and gun arrests, and that he personally had made firearms arrests in that area before March 2024. June 8 Hr'g Tr. 13:20–14:15. Officer Van Brunt likewise testified that the area is one of the most violent areas in the 22nd District, with multiple shootings, homicides, drug activity, and gun confiscations, and that he too had made gun-related arrests there. July 8 Hr'g Tr. 5:21–6:16.

At approximately 5:25 p.m., the officers observed Defendant walking eastbound on Montgomery Avenue toward 25th Street. Officer Goberdhan was driving, and Officer Van Brunt was in the passenger seat. June 8 Hr'g Tr. 13:22–14:4, 14:16–15:7; July 8 Hr'g Tr. 5:13–20. Defendant was wearing a red hoodie, dark pants, a black mask, a black hat, and his hood up. July 8 Hr'g Tr. 6:22–7:4. Defendant was walking with a woman and child, and both officers observed that Defendant walked with a slight limp and was favoring his right side. June 8 Hr'g Tr. 17:8–10, 18:1–5; July 8 Hr'g Tr. 8:12–17.

Officer Goberdhan testified that, as the patrol vehicle passed Defendant, he looked to his right and saw "a very heavy-weighted, L-shaped object" in Defendant's front hoodie pocket. He alerted Officer Van Brunt, and the officers quickly circled the block to return to Defendant's location. June 8 Hr'g Tr. 15:8–23. Officer Van Brunt also testified that he personally observed a

heavy, L-shaped weighted object in Defendant's front hoodie pocket that looked like a firearm. July 8 Hr'g Tr. 6:22–7:4. The officers conferred in the patrol vehicle and, according to Officer Van Brunt, "both seen the same thing." *Id.* at 8:5–8.

When the officers circled back, the object remained visible in Defendant's front hoodie pocket. Officer Goberdhan testified that Defendant's hand was on the object and appeared to push it downward, making what he believed to be the barrel more prominent. June 8 Hr'g Tr. 15:19–23. Based on the object's weight and shape, and his experience with firearms arrests, Officer Goberdhan recognized it as a possible firearm. Id. at 16:6–17:7. Officer Van Brunt's testimony corroborated that the heavy weighted object remained visible when the officers returned. July 8 Hr'g Tr. 8:9–17.

The officers pulled over near Montgomery Avenue and Stillman Street, and Officer Goberdhan activated his body-worn camera as they approached Defendant. June 8 Hr'g Tr. 18:8–23. The footage included a sixty-second pre-activation buffer without audio, but both officers explained that the buffer began only after the officers had already passed Defendant and begun circling the block. Id. at 19:1–12, 37:24–38:14; July 8 Hr'g Tr. 12:8–23. Officer Goberdhan further explained that his camera faced forward from his upper left chest while he drove, even though his eyes could look to the right. June 8 Hr'g Tr. 39:7–40:6. The Court credits those explanations and does not view the absence of the officers' initial observation on the body-worn camera footage as undermining their testimony.

When the officers exited the patrol vehicle, Officer Goberdhan approached from the front while Officer Van Brunt came from the side. July 8 Hr'g Tr. 8:20–24. Defendant's right hand remained in his hoodie pocket, on or near the suspected firearm, while he held a bag in his left hand. *Id*. at 8:20–9:6. Officer Goberdhan asked whether Defendant had a permit "for that," and

3

Defendant responded, "Yes." June 8 Hr'g Tr. 19:13–20:1; July 8 Hr'g Tr. 9:1–6. The officers then directed Defendant to remove his hand from the firearm. June 8 Hr'g Tr. 19:13–20:1. Both officers testified that the command and the removal of Defendant's hand were based on officer safety and the need to verify whether Defendant was licensed to carry. June 8 Hr'g Tr. 22:22–23:13; July 8 Hr'g Tr. 32:2–11.

Officer Van Brunt then removed Defendant's hand from the hoodie pocket. Once he did so, he saw the butt of the firearm in the front pocket, removed the firearm for safekeeping, and made it safe. July 8 Hr'g Tr. 9:1–14. Officer Goberdhan likewise testified that the firearm was recovered from Defendant's front hoodie pocket in his presence. June 8 Hr'g Tr. 20:7–19. Defense counsel elicited that approximately twelve seconds passed between Officer Van Brunt exiting the patrol vehicle and physically taking hold of Defendant's wrist. July 8 Hr'g Tr. 24:12–22.

The Government introduced still images from both officers' body-worn camera footage. Officer Goberdhan testified that Government Exhibit 2 showed Defendant's hand on the firearm and the bottom of the hoodie where the barrel pushed downward and protruded through the fabric. June 8 Hr'g Tr. 26:7–23. Officer Van Brunt testified that a still image from his footage showed Defendant's front hoodie pocket and the butt of the firearm, including the magazine area, after Defendant's hand had been removed. July 8 Hr'g Tr. 13:10–24.

The Court has independently reviewed the body-worn camera footage and still images admitted into evidence. The footage does not capture the officers' first observation of Defendant before they circled the block, which is consistent with both officers' explanation that the sixty-second buffer began after the officers had already passed Defendant and begun circling back. June 8 Hr'g Tr. 37:24–38:14; July 8 Hr'g Tr. 12:8–23. The footage does, however, confirm that the encounter occurred in daylight and that Defendant was plainly visible to the officers as they drove

4

past and then approached him. It also depicts Defendant wearing a relatively fitted red hoodie, with his hand in the front pocket and a visible shape or protrusion in that area. The Court's own review of the footage and still images corroborates, in material respects, the officers' testimony about their ability to observe Defendant and about what they observed immediately before the firearm was secured. Gov't Exs. 1–4; June 8 Hr'g Tr. 23:14–24:2, 26:7–23, 40:21–41:7; July 8 Hr'g Tr. 11:21–12:23, 13:10–24.

Officer Van Brunt also testified that, before the officers exited the patrol vehicle, Defendant bladed his body away from them. He explained that Defendant had his hand in his pocket on the heavy L-shaped object, pushed the item down, made the protrusion more visible through the hoodie pocket, and turned his body "just a little bit" as if hiding the object. July 8 Hr'g Tr. 30:17–31:13. The Court considers that testimony together with the officers' testimony that Defendant was favoring his right side, manipulating the object, and keeping his hand on or near the suspected firearm as the officers approached.

After the firearm was recovered, Defendant stated that his permit was at home and that he did not have it with him. Officers asked for his name and date of birth so they could check whether he had a license to carry through law enforcement databases, but Defendant refused to provide that information. June 8 Hr'g Tr. 20:1–6. Officer Van Brunt similarly testified that Defendant said the permit was at the house, could not produce a permit, and did not provide identification, his name, or his date of birth. July 8 Hr'g Tr. 10:4–20. Because Defendant continued to refuse to identify himself, officers transported him to the 22nd District, where Officer Goberdhan used a mobile fingerprint scanner to identify him. June 8 Hr'g Tr. 21:17–22:21; July 8 Hr'g Tr. 10:21–11:8. The mobile fingerprint scanner identified Defendant as Derrick Chappelle and revealed an active homicide warrant and a second federal supervision warrant. June 8 Hr'g Tr. 27:24–28:19.

The firearm was a black Ruger P95 with fifteen live rounds. July 8 Hr'g Tr. 9:9–14. Officer Van Brunt testified that the firearm's serial number appeared altered or obliterated and that there was no serial number on the firearm. *Id.* at 9:15–22. The Government also introduced photographs of the firearm, the magazine, the fifteen live rounds, and the area where the serial number should have appeared. *Id.* at 14:6–15:6. The firearm itself was admitted as Government Exhibit 7. *Id.* at 15:7–24.

The Court credits Officers Goberdhan and Van Brunt. Their testimony aligned on the material points: both officers observed the same heavy, L-shaped object in Defendant's front hoodie pocket; both connected that object to a possible firearm based on their experience; and both described Defendant keeping his hand at the pocket as they approached. The body-worn camera footage and still images do not capture every moment the officers described, but they corroborate the important parts they do capture, including Defendant's visibility, the fitted red hoodie, his hand placement, and the visible protrusion in the front pocket area.

The gap in the footage does not create any reasonable doubt in the Court's mind about the officers' initial observation. Both officers explained why the cameras did not record that moment: the footage began after the officers had already passed Defendant and begun circling back. The Court finds that explanation credible. On this record, the Court finds that before any physical seizure occurred, the officers had already observed a weighted, L-shaped object consistent with a firearm, saw Defendant manipulate or maintain control over that object, and reasonably acted to separate his hand from the suspected weapon for officer safety.

## II.    LEGAL STANDARD

The Fourth Amendment protects against unreasonable searches and seizures. U.S. Const. amend. IV. Police-citizen encounters generally fall into three categories: consensual or "mere" encounters, investigative detentions, and arrests. *United States v. Brown*, 765 F.3d 278, 288 (3d Cir. 2014). A mere encounter requires no suspicion. An investigative detention requires reasonable suspicion that criminal activity is afoot. *Terry v. Ohio*, 392 U.S. 1, 21–22, 30 (1968); *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). An arrest requires probable cause, meaning facts and circumstances sufficient to warrant a prudent person in believing that the suspect has committed or is committing an offense. *Beck v. Ohio*, 379 U.S. 89, 91 (1964); *Brown*, 765 F.3d at 288.

A seizure occurs when, under the totality of the circumstances, a reasonable person would not feel free to leave or otherwise terminate the encounter. *United States v. Crandell*, 554 F.3d 79, 84–85 (3d Cir. 2009); *United States v. Mendenhall*, 446 U.S. 544, 554–55 (1980). Relevant factors include the threatening presence of officers, physical touching, display of weapons, and language or tone suggesting that compliance is compelled. *Crandell*, 554 F.3d at 85.

Reasonable suspicion is a less demanding standard than probable cause, *Alabama v. White*, 496 U.S. 325, 330 (1990), although it requires more than an inchoate hunch. Courts consider the totality of the circumstances and ask whether officers had a particularized and objective basis for suspecting legal wrongdoing. *United States v. Arvizu*, 534 U.S. 266, 273 (2002). Officers may rely on their training and experience to draw inferences from the facts before them. *Id.* Presence in a high-crime area is not sufficient by itself, although it is a relevant contextual factor. *Wardlow*, 528 U.S. at 124. Conduct susceptible to an innocent explanation may still contribute to reasonable suspicion when considered with the totality of the circumstances. *United States v. Whitfield*, 634 F.3d 741, 744 (3d Cir. 2010).

When officers lawfully stop an individual and reasonably believe the person is armed and dangerous, they may take reasonable protective measures to secure the weapon and protect officer safety. *Terry*, 392 U.S. at 27; *Adams v. Williams*, 407 U.S. 143, 146 (1972).

## III.    DISCUSSION

Defendant argues that the encounter was never consensual and became an unlawful stop when the officers targeted him, circled the block, approached him, ordered him to remove his hand from his pocket, and secured the firearm. The Government responds that the initial contact began as a mere encounter and became an investigative detention only after officers confirmed the presence of a firearm and Defendant failed to produce a permit.

The Court need not decide the precise moment the encounter became a seizure. Even assuming Defendant was seized at the earliest point supported by the record, the officers already had reasonable suspicion by then. Before Officer Van Brunt removed Defendant's hand and secured the firearm, the officers had observed a heavy, L-shaped object weighing down the front pocket of Defendant's fitted hoodie; saw Defendant's hand on and manipulating that object; recognized the object as a possible firearm based on their experience; and approached while Defendant's hand remained at the pocket. Those facts justified both a limited investigative detention and the protective seizure of the suspected weapon.

### A. The Officers Had Reasonable Suspicion to Investigate Unlawful Firearm Possession.

Reasonable suspicion is not as demanding a standard as probable cause, but it requires more than a hunch. It asks whether, under the totality of the circumstances, officers had a particularized and objective basis for suspecting legal wrongdoing. *Arvizu*, 534 U.S. at 273. Courts must consider the facts together, not in isolation, and must allow officers to draw on their training

and experience to make common-sense judgments about what they see. *Id.* at 273–74. Conduct that might have an innocent explanation can still support reasonable suspicion when combined with other facts. *Whitfield*, 634 F.3d at 744.

A high-crime location does not, by itself, create reasonable suspicion, and the Court does not treat it as doing so here. *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) (explaining that presence in an area of expected criminal activity is relevant to the totality of the circumstances but is not enough, standing alone, to support reasonable suspicion). This is not a flight case. Defendant did not run, evade the officers, discard anything, or otherwise behave as the defendant did in *Wardlow*. The character of the area nevertheless remains part of the totality of the circumstances. Both officers testified that 25th Street and Montgomery Avenue is an area known for shootings, homicides, and firearms arrests, and that they personally had made gun arrests there before March 2024. June 8 Hr'g Tr. 13:20–14:15; July 8 Hr'g Tr. 5:21–6:16. That testimony does not substitute for particularized suspicion of Defendant, but it informs the reasonableness of the officers' interpretation of what they personally observed.

This case also differs from cases involving only an anonymous tip or bare suspected gun possession. In *Florida v. J.L.*, officers relied solely on an anonymous tip that a person at a bus stop had a gun, and the Supreme Court rejected a rule allowing officers to stop someone based on suspected firearm possession alone. 529 U.S. 266, 271–74 (2000). In *United States v. Ubiles*, the Third Circuit found no reasonable suspicion where officers acted on a tip that the defendant possessed a gun at a festival, without information suggesting unlawful possession. 224 F.3d 213, 217–18 (3d Cir. 2000). In *United States v. Lewis*, information that occupants of a car may have had firearms did not establish reasonable suspicion absent facts suggesting illegality. 672 F.3d 232,

240–41 (3d Cir. 2012). Those cases foreclose any rule that suspected firearm possession automatically justifies a stop. The Court applies that limitation here.

The officers did not act on an anonymous tip, a generalized suspicion, or a bare report of firearm possession. They acted on their own observations. As the patrol car passed Defendant in daylight, the officers saw a heavy, L-shaped object weighing down the front pocket of Defendant's fitted hoodie. June 8 Hr'g Tr. 15:8–23; July 8 Hr'g Tr. 6:22–7:4. When the officers circled back, the object remained visible; Defendant's hand was on or pushing down the object; and the movement made what appeared to be the barrel more pronounced. June 8 Hr'g Tr. 15:19–23; July 8 Hr'g Tr. 8:9–17. Officer Van Brunt also testified that Defendant slightly bladed his body away while pushing the object downward, making the protrusion more visible through the hoodie pocket. July 8 Hr'g Tr. 30:17–31:13. The body-worn camera footage and still images, which the Court independently reviewed, corroborate that Defendant was plainly visible, that the encounter occurred in daylight, and that the front pocket area showed a visible protrusion consistent with the officers' description. Gov't Exs. 1–4.

Those facts supplied reasonable suspicion. The Court does not rely on an assumption that guns are inherently unlawful, nor does it treat the location alone as sufficient. It relies on the combined weight of the particularized facts known before the seizure: the object's weight, shape, and location; Defendant's hand placement and manipulation of the object; the slight blading movement; the officers' firearms experience; and the safety concern created by Defendant's hand remaining on the suspected firearm as the officers approached. As discussed in the next section, the Philadelphia setting and § 6108 inform the legal significance of those observations, but they do not replace the requirement of particularized suspicion. Here, that requirement was met.

A. **Section 6108 is Relevant to Reasonable Suspicion, But it Does Not Create a Per Se Rule.**

The Philadelphia setting for this case matters because Pennsylvania law treats carrying a firearm on public streets or public property in Philadelphia differently from carrying elsewhere in the Commonwealth. Under 18 Pa. Cons. Stat. § 6108, a person may not carry a firearm "upon the public streets or upon any public property" in Philadelphia unless licensed to carry or otherwise exempt. The statute therefore makes licensure or exemption central to whether carrying a firearm in that location is lawful.

That does not mean § 6108 permits officers to stop every person they suspect may have a firearm in Philadelphia. The Fourth Amendment supplies the governing standard, but state law informs what conduct the officers could reasonably suspect was unlawful. Federal law does not permit officers to stop a person based on suspected firearm possession alone, and Pennsylvania law likewise does not permit police to treat firearm possession as presumptively criminal. *J.L.*, 529 U.S. at 272; *Ubiles*, 224 F.3d at 217–18; *Lewis*, 672 F.3d at 240–41; *Commonwealth v. Hicks*, 208 A.3d 916, 936–37 (Pa. 2019). The Court considers *Hicks* for that limited purpose: not as controlling federal Fourth Amendment authority, but as persuasive guidance on Pennsylvania's treatment of firearm possession. It confirms that lawful gun possession cannot be converted into reasonable suspicion by assumption alone.

Section 6108 operates within those limits. It does not authorize suspicionless license checks. It becomes relevant only once officers have particularized facts indicating that a person is carrying a firearm on a Philadelphia street. At that point, the statute identifies the question officers may investigate: whether the carrying is licensed or otherwise exempt. Here, because the officers had those particularized facts before the seizure, § 6108 made licensure or exemption legally

11

significant and properly informed the totality-of-the-circumstances analysis without creating a per se rule.

Section 6122 is related but narrower. It requires a licensed individual carrying a concealed firearm to produce the license upon lawful demand. The Court does not rely on § 6122 to justify the initial seizure; the demand was lawful only if the officers already had reasonable suspicion. Once they did, Defendant's inability to produce a permit and refusal to provide identifying information reasonably prolonged the encounter so the officers could verify whether he was licensed.

### B.  The Protective Seizure of the Firearm was Reasonable.

The officers also had a valid officer safety basis to secure the weapon. *Terry* permits a limited protective search when an officer reasonably believes a person is armed and dangerous. 392 U.S. at 27. *Adams v. Williams*, 407 U.S. 143 (1972) is particularly instructive. There, an officer received information that the defendant had a gun at his waist. The officer approached the vehicle, asked the defendant to open the door, and when the defendant instead rolled down the window, the officer reached into the car and removed the gun from the defendant's waistband. *Id.* at 145. The Supreme Court held that the officer's limited action was reasonable, explaining that the Fourth Amendment does not require an officer who has reason to believe a person is armed to take unnecessary risks before securing the weapon. *Id.* at 146.

The officers reasonably believed Defendant had a firearm in the front pocket of his hoodie, and by the time they approached, his hand remained on or immediately next to that suspected firearm. That fact created a concrete officer-safety concern. Officer Goberdhan testified that the officers told Defendant to remove his hand so they could continue the encounter safely. June 8 Hr'g Tr. 22:22–23:13. The officers were not required to question Defendant at close range while

12

his hand remained on what they reasonably believed was a firearm. Officer Van Brunt's act of removing Defendant's hand and securing the firearm was limited, targeted, and directly tied to that safety concern.

Defendant's statement that he had a permit does not defeat the safety rationale. A claimed permit does not prove licensure, and it does not neutralize the risk presented by a person's hand remaining on a suspected firearm during a close-range police encounter. Defendant's answer may have supported his claim of lawful carry, but it also confirmed that he understood the officers were asking about a firearm. The officers were entitled to secure the weapon first and then investigate licensure.

### C. The Continued Detention to Verify Licensure and Identity was Reasonable.

After the firearm was secured, Defendant stated that his permit was at home and then refused to provide his name and date of birth. June 8 Hr'g Tr. 20:1–6. At that point, the officers had recovered a firearm from Defendant's front hoodie pocket, Defendant had not produced a license to carry, and the officers had no way to verify his claim that he was licensed. Officer Goberdhan testified that the officers asked for Defendant's name and date of birth so they could check whether he had a license to carry through law enforcement databases. *Id*. Defendant's refusal to identify himself prevented that check. *Id*. Officer Van Brunt also testified that, after removing the firearm, he made it safe and observed that it was a black Ruger P95 loaded with fifteen live rounds. July 8 Hr'g Tr. 9:9–14. He further testified that the firearm's serial number appeared altered or obliterated, and that there was no serial number visible on the firearm. *Id*. at 9:15–22. That observation gave the officers an additional basis to continue the investigation after the firearm was recovered.

13

A valid *Terry* stop may last long enough for officers to diligently pursue the investigation that justified the stop. *See United States v. Sharpe*, 470 U.S. 675, 686 (1985). Here, the purpose of the detention was to determine whether Defendant could lawfully carry the firearm officers had just recovered. Transporting Defendant to the 22nd District for fingerprint identification was a more intrusive step, but it followed Defendant's continued refusal to identify himself and the officers' inability to verify licensure by less intrusive means. The fingerprint scan identified Defendant and revealed an active homicide warrant and a second federal-supervision warrant. June 8 Hr'g Tr. 21:17–22:21, 27:24–28:19. Those warrants supplied an independent basis for arrest.

## D.  The Court Need Not Rely on *Strieff* or Inevitable Discovery

The Government also invokes *Utah v. Strieff*, 579 U.S. 232 (2016), and, separately, the inevitable discovery doctrine. The Court need not rely on either.

*Strieff* is an attenuation case, not an inevitable discovery case. It applies when evidence is actually discovered after an unlawful stop, but an intervening circumstance breaks the causal connection between the illegality and the evidence. In *Strieff*, officers discovered a valid preexisting arrest warrant before conducting the search that produced the challenged evidence. *Id*. at 235–36, 238–42. The warrant intervened between the unlawful stop and the later search. The sequence here is different. Officers recovered the firearm before they identified Defendant and before they learned of the outstanding warrants. The warrants, therefore, did not intervene between the seizure and discovery of the firearm in the way the warrant did in *Strieff*.

Inevitable discovery is a separate doctrine. It would require the Government to show that, even if the initial seizure were unlawful, officers inevitably would have discovered the firearm through lawful means—for example, by identifying Defendant, discovering the warrants, arresting

14

him, and searching him incident to that arrest. The Court need not decide whether the Government has made that showing. The officers had reasonable suspicion before the seizure, lawfully secured the firearm for officer safety, and lawfully continued the detention to verify Defendant's identity and licensure. The firearm is admissible on that basis.

### E.  Defendant's State Court Argument Does Not Warrant Suppression

Defendant also raises a separate due process argument in his brief based on the earlier state firearms prosecution arising from the same March 8, 2024 incident. He contends that the state case could not have proceeded because of alleged violations of Pennsylvania Rule of Criminal Procedure 600, and that the later federal prosecution therefore violates due process or requires suppression of the firearm and ammunition. That argument fails.

This Court's suppression analysis is governed by federal law. Rule 600 is a Pennsylvania procedural rule governing the timing of state criminal prosecutions. It does not bar a later federal prosecution brought by a separate sovereign, even one arising from the same incident. Nor does it require suppression in federal court merely because the related state charges were nolle prossed or because Defendant believes he had a viable state speedy trial argument. See *United States v. Wilson*, 413 F.3d 382, 390 & n.10 (3d Cir. 2005).

Defendant has not identified any state court suppression ruling that precludes the Government from litigating admissibility here. Nor has he shown that the alleged Rule 600 issue affected the legality of the March 8, 2024 stop, the recovery of the firearm, or the admissibility of the firearm under federal law. Any remedy for a Rule 600 violation would have been sought in the state case. It does not provide a basis to suppress otherwise admissible evidence in this federal prosecution.

15

## IV.    Conclusion

The officers had reasonable suspicion before the seizure. They personally observed facts suggesting Defendant was carrying a firearm in his hoodie pocket, saw Defendant's hand on and manipulating the suspected firearm, encountered him in a high-crime area on a public street in Philadelphia, and reasonably acted to secure the weapon for officer safety. The subsequent detention to verify identity and licensure was reasonable after Defendant could not produce a license and refused to identify himself. Defendant's remaining arguments do not warrant suppression.

The motion to suppress will therefore be denied.